IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                            No. CR 00-51 MV

LEWIS ABERNATHY

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motions to Suppress Physical Evidence Seized and Statements filed March 30, 2000 **[Doc. No. 28]**. A hearing was held on this matter on March 30, 2001. The Court, having considered the motions, responses, testimony of witnesses, oral argument of counsel and being otherwise fully informed, finds that the motion to suppress is well-taken and will be **granted.**

## FACTUAL BACKGROUND

The following are the undisputed facts. On November 21, 2000, at about 8:00 or 8:30 pm, New Mexico State Police Officer Bess stopped a 1989 Mazda on I-40 for speeding. The car was traveling 91 mph in a 75 mph zone. Lewis Abernathy was a passenger in the car; Samuel Simpson was the driver. Both are elderly black men. When Officer Bess asked Mr. Simpson for his license, Mr. Simpson did not respond. Mr. Abernathy responded that it was his car, and that Mr. Simpson was driving because Mr. Abernathy was tired. Mr. Abernathy then produced a valid driver's licence, vehicle title and registration, indicating Mr. Abernathy was the

owner of the vehicle.  Officer Bess retained the documents.  DEA reports state that as Officer Bess waited for Mr. Abernathy to gather his papers, he noticed a strong odor of air freshener coming from the car.  Officer Bess also testified that he noticed that the key chain in the ignition had only two keys.

Officer Bess told Mr. Abernathy to remain in the car and ordered Mr. Simpson out of the vehicle.  Mr. Simpson then told Officer Bess that his license had expired, and gave Officer Bess his Social Security card.  Officer Bess then began questioning Mr. Simpson about his trip.  According to Officer Bess, Mr. Simpson said he was traveling from Los Angeles to Oklahoma, that he was along to help his friend out on the drive, that he was supposed to get on a bus in Albuquerque to return to Los Angeles, that Mr. Abernathy asked him the night before to help on the drive, and that he had known Mr. Abernathy for about two to three years.  Officer Bess checked his computer for warrants on Mr. Simpson.  None were found.

As Officer Bess questioned Mr. Simpson, another New Mexico State Police Officer, Rudy Mora, arrived and began questioning Mr. Abernathy, who was still in the car.  Officer Bess was still in possession of Mr. Abernathy's documents.  Officer Mora asked Mr. Abernathy about his trip.  After he questioned Mr. Abernathy for a few minutes, Officer Mora told Mr. Abernathy "You'll probably be free to go here in a few minutes, you'll be down the road."

Officer Bess, meanwhile, explained to Mr. Simpson his options regarding the speeding ticket, and Mr. Simpson eventually decided to admit his infraction and pay by mail.  Officer Bess then returned Mr. Simpson's Social Security card and issued Mr. Simpson his citation.  Officer Bess then asked Mr. Simpson if he had any luggage in the vehicle and whether he was transporting any illegal drugs, weapons, or contraband.  Mr. Simpson said no.  According to Officer Bess, he asked Mr. Simpson if he could search the car.  Mr. Simpson said that it wasn't

his car and that Officer Bess would have to ask Mr. Abernathy. Officer Mora then reported back to Officer Bess that Mr. Abernathy stated that his destination was Missouri; that he had asked Mr. Simpson to join him on the trip a week before they began; and that they had known each other for thirty years. Officer Bess instructed Mr. Simpson to remain where he was. Officer Bess then approached Mr. Abernathy, who was still seated in the car as instructed. According to Officer Bess, he then returned Mr. Abernathy's documents and began questioning Mr. Abernathy. Bess asked Mr. Abernathy if he knew where Mr. Simpson lived. Officer Bess asked Mr. Abernathy if the luggage in the car was his and if there were drugs, illegal guns or contraband in the car. Mr. Abernathy answered that the luggage was his and that there were no drugs, illegal guns or contraband in the car.

  Officer Bess stated that he asked Mr. Abernathy for permission to search the car, that Mr. Abernathy got out of the car and "angrily" responded, "I guess I have no choice since you have me stopped." Officer Bess contends that he then explained that Mr. Abernathy did not have to permit the officers to search. Officer Bess states that Mr. Abernathy simply "brushed" past Officer Bess quickly and opened his trunk. The Government contends that Mr. Abernathy said "go ahead," but Mr. Abernathy contends that Officer Bess' testimony does not support that Mr. Abernathy ever said anything. Officer Bess testified that after he told Mr. Abernathy that he did not have to consent, Mr. Abernathy exited the car, brushed past him, and "was like well go ahead." Mr. Abernathy contends that it is not clear whether he stated "well go ahead," made a body gesture or gave some verbal response that indicated to Officer Bess that Mr. Abernathy consented to a search.

  Officer Bess states that Mr. Abernathy then began to take various items out of the trunk and drop them on the ground, until Officer Bess told Mr. Abernathy to step away from the car

3

and allow the officers to take the items out.  Officers Bess and Mora then began to search the trunk and found a locked suitcase.  Officer Bess testified that Mr. Abernathy protested and asked why his personal belongings were being searched.  The officers asked Mr. Abernathy if he had a key.  Officer Bess testified that Mr. Abernathy tried every key except one, then dropped his keys on the ground next to the suitcase and said the key might be in the car.  Officer Mora picked up the keys and tried the one Mr. Abernathy did not try, which opened the suitcase.  Mr. Abernathy then began to search the rear middle armrest while Officer Bess watched.  Officer Mora found a box of bullets in the suitcase and asked Mr. Abernathy if there was a gun in the car. Mr. Abernathy said yes.  A .380 Davis Industries weapon was found behind the rear seat armrest.

Officer Mora then deployed a certified drug detection dog in and around the car.  Officer Mora contends that the dog, Lady, alerted to the trunk and the rear seat of the car.  Upon close inspection of the rear seat area, Officers Mora and Bess discovered a hidden compartment behind the back seat.  They observed a home-made locking mechanism.  They then placed both Mr. Simpson and Mr. Abernathy under investigative detention and towed the vehicle back to the police station for closer inspection. When the seat was pried forward at the station, Officer Mora observed several packages in the compartment.  He obtained a sample and the substance tested positive for cocaine.  Mr. Simpson and Mr. Abernathy were placed under arrest.  Mr. Simpson is not charged in this case.

## **DISCUSSION**

The Fourth Amendment protects individuals from unreasonable searches and seizures.  *See* U.S. Const. amend. IV.  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  *United States v. Hunnicut*, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting *Delaware v.*

*Prouse*, 440 U.S. 648, 653 (1979)). However, because an ordinary traffic stop is a limited seizure, it is analyzed more like an investigative detention than a custodial arrest. *See Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984) ("[T]he usual traffic stop is more analogous to a so-called 'Terry stop' ... than to a formal arrest"). Therefore, "[t]o determine the reasonableness of an investigative detention, we make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonable related in scope to the circumstances which justified the interference in the first place.'" *Hunnicut*, 135 F.3d at 1348.

The stopping of a vehicle for a traffic violation is ordinarily a limited seizure. *See United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988) *overr'd on other grounds*, *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995) (citing *United States v. Gonzalez*, 763 F.2d 1127, 1130 n. 1 (10th Cir.1985)). A traffic stop must "last no longer than is necessary to effectuate the purpose of the stop" and "be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Therefore, "[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check and issue a citation." *Guzman*, 864 F.2d at 1519. But "[o]nce a driver has produced a valid license and proof that he is entitled to operate the car, 'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Walker*, 933 F.2d 812, 816 (10th Cir. 1991) (citing *Guzman*, 864 F.2d at 1519) (emphasis added)). "In order to justify 'a temporary detention for questioning,' the officer must also have reasonable suspicion 'of illegal transactions in drugs or of any other serious crime.'" *Walker*, 864 F.2d at 1519 (citations omitted). Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances. *See United States v. Soto,* 988 F.2d 1548, 1544 (10th Cir. 1993) (citing *United*

5

*States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Ward*, 961 F.2d 1526, 1529 (10th Cir.1992)).

## A.  Officers' Conduct Exceeded Scope of Stop

In this case, it is undisputed that the initial stop was justified.  Mr. Simpson admitted the speeding infraction.  However, the officers' continued questioning and detention of Mr. Simpson and Mr. Abernathy exceeded the scope of the initial justification for the stop.  Officer Bess, while he was holding Mr. Simpson's and Mr. Abernathy's documents, questioned Mr. Simpson about his travel plans.  Officer Bess also instructed Officer Mora to question Mr. Abernathy about his travel plans, in an effort to compare his answers with those received from Mr. Simpson, while Officer Bess retained Mr. Abernathy's documents.  Such questions were beyond the scope of the initial justification for the stop.  It is immaterial in the Tenth Circuit whether such questioning resulted in a longer detention than would otherwise have been necessary to resolve the justification for the initial stop.  As the Tenth Circuit has stated, "there are limitations on both the length and the manner of the detention." *United States v. Holt*, 229 F.3d 931, 936 (10th Cir. 2000).  *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").  The Tenth Circuit went on to state that "[a]n officer conducting a routine traffic stop may not ask the detainee questions unrelated to the purpose of the stop, even if the questioning does not extend the normal length of the stop, unless the officer has reasonable suspicion of illegal activity." *Holt*, 229 F.2d at 936 (citing *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995)); *see also United States v. Walker*, 933 F.2d 812, 816 (10th Cir. 1991) (stop exceeded scope when officer detained defendant to ask him questions unrelated to speeding

6

infraction or to defendant's right to operate the car).  In *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995), the Tenth Circuit stated that although the duration of the detention was justified, the officer's questioning about contraband in the car, which was beyond the scope of the initial stop, was only justified if the officer had reasonable suspicion that the suspect was transporting drugs.

The officers pulled over the car because Mr. Simpson was speeding.  Mr. Simpson was not the owner of the car; the car belonged to Mr. Abernathy.  Mr. Abernathy produced valid documentation that indicated that he owned the vehicle.  Thus, there was no reason to question Mr. Abernathy.  Nonetheless, while still retaining Mr. Abernathy's documents, Officer Mora proceeded to question Mr. Abernathy about his travel plans, in an effort to compare his answers with Mr. Simpson's.  The officers were not entitled to ask Mr. Abernathy about his travel plans.  As the Tenth Circuit has stated in *Hoyt*, the court has never held that questioning about travel plans is within the scope of an ordinary traffic stop.  "[N]one of the decisions explore or explain why it is constitutionally permissible for an officer to ask a detainee about his or her travel plans if the questioning is unrelated to the purpose of the stop." *Hoyt*, 229 F.3d at 937.  Whether questioning about travel plans generally is within the scope of an ordinary traffic stop is not at issue.  The Court recognizes that the permissible scope of an investigatory detention depends on "the particular facts and circumstances of each case." *Id.* (citing *Royer*, 460 U.S. at 500).

In this case particularly, the questions about travel plans was not permissible.  This was not simple, unintrusive casual conversation; this was an effort to detain Mr. Abernathy for longer than was necessary in an effort to gather incriminating information.  Questioning about travel plans had nothing to do with the fact that Mr. Simpson was speeding, or that Mr. Simpson was driving under an expired license.  That the questions about travel plans were not routine

questions, and not related to the initial stop, is evident by the fact that the officers consulted with one another and compared Mr. Abernathy's and Mr. Simpson's answers.  Further, immediately after the officers determined that the two men gave conflicting answers, they asked each if there were drugs, weapons or contraband in the car and asked for consent to search.  This Court finds that the questioning that occurred between Mr. Simpson and Mr. Abernathy was not related to the justification for the initial stop.  Rather, the questioning was designed to ferret out incriminating information to develop a basis for further questioning and ultimately a search.  As such, the questioning was constitutionally impermissible.

### B.  No Reasonable Suspicion

In order to continue questioning Mr. Abernathy, the officers must have had a particularized and objective basis for suspecting Mr. Abernathy of criminal activity.  *See United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999).  After the officers questioned Mr. Simpson and Mr. Abernathy about their travel plans, they continued to question them even after the purpose for the initial stop was concluded.  By the officers' account, they returned the documents to Mr. Simpson and Mr. Abernathy.  Officer Bess received valid documentation from Mr. Abernathy indicating that he was the lawful owner of the 1989 Mazda.  Officer Bess issued a citation to Mr. Simpson for speeding.  There was no justification to further question Mr. Simpson or Mr. Abernathy.  The two gentlemen should have been allowed to proceed on their way.  *See Walker*, 933 F.2d at 816 (police officer's detention of motorist after speeding ticket had been issued and subsequent questions about circumstances unrelated to speeding infraction was an unreasonable seizure under the Fourth Amendment).  Assuming as true the officers' version of events, the only information that the officers had at the point at which they started questioning

Mr. Abernathy about whether there were drugs in the car were that there was a strong odor of air freshener emanating from the car; the key chain had two keys on it; and Mr. Abernathy was looking at Officer Bess and Mr. Simpson while Mr. Simpson was being questioned.[1]  This does not constitute reasonable suspicion of criminal activity.

### C.  Encounter Was Nonconsensual

Officer Mora's questioning cannot be characterized as a consensual conversation.  Officer Bess still had Mr. Abernathy's documents.   A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.  *See United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir.1996).  "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law

---

[1] The fact that the officers contend that Mr. Abernathy and Mr. Simpson gave conflicting answers about their travel plans is not considered by this Court in determining whether they had reasonable suspicion to continue questioning the men.  The Court has found above that the questions about travel plans were constitutionally impermissible as they were beyond the scope of the initial stop.  Therefore, Mr. Abernathy's answers to those questions would be suppressed.  Nonetheless, even if the Court were to consider the answers, the Court finds that the two men's answers were not inconsistent and thus did not appropriately give rise to reasonable suspicion of criminal activity.  Their answers were not identical, but that does not mean they were inconsistent.  There were two different officers asking the questions; and, as highlighted explicitly with respect to one answer, their answers were not identical because the officers asked them different questions.  For instance, although they gave different times as to when they left Los Angeles, Mr. Simpson was asked when Mr. Abernathy picked him up; whereas Mr. Abernathy was asked when they left Los Angeles.  As to their destination, there essentially wasn't a discrepancy.  They both stated that Mr. Simpson was going to Albuquerque and then taking a bus back to Los Angeles.  The discrepancy was that Mr. Simpson stated that Mr. Abernathy was going on to Oklahoma, and Mr. Abernathy stated that he was going on to Missouri.  Mr. Abernathy was going through Oklahoma, and the fact that Mr. Simpson was mistaken as to Mr. Abernathy's final destination, or did not know, is not significant.  Another discrepancy was that Mr. Abernathy stated that he made arrangements for Mr. Simpson to drive with him a couple of weeks before, whereas Mr. Simpson said it was the night before they left.  But Mr. Abernathy explained that he asked Mr. Simpson's ex-wife two weeks before.  Therefore, it was correct that he didn't actually ask Mr. Simpson until the night before.  There was no testimony about whether the officers asked the two men the same questions.  Therefore, the Court cannot credit their observations that the answers were "inconsistent."  They were certainly close enough, and had reasonable explanations that were not at all consistent with criminal activity.  Similarly, the other discrepancy was that Mr. Abernathy stated that he knew Mr. Simpson for 30 years whereas Mr. Simpson stated he knew Mr. Abernathy for two to three years.  Mr. Abernathy explained that he has known Mr. Simpson's ex-wife for that long.  Therefore, the difference is one of semantics, not criminal activity.

9

enforcement officer." *Id.* Whether an encounter can be deemed consensual depends on "whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* An unlawful detention occurs when the driver has an "objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *Hernandez*, 93 F.3d at 1498.

The officers retained Mr. Abernathy's documentation while they questioned him. Thus, the encounter was not consensual. *See United States v. Burch*, 153 F.3d 1140, 1143 (10th Cir. 1998) (undue retention of a defendant's documents renders the encounter nonconsensual); *see also Florida v. Royer*, 460 U.S. 491, 501-03 (1983); *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993); *United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir. 1993) ("When [Officer] Barney questioned defendant about matters unrelated to the initial traffic stop, the detention entered a new phase. Barney still retained defendant's license and registration at that point, so defendant was not free to leave. Thus, any questions asked were not part of a consensual encounter between officer and citizen, but were elements of an investigative detention."). As the Tenth Circuit went on in *Burch*, "[i]n a Terry stop or routine traffic stop, an officer's retention of a defendant's documents is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search." *Id.* (citing *United States v. Lee*, 73 F.3d 1034, 1040 (10th Cir.1996); *United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995) ("[W]hat began as a consensual encounter quickly became an investigative detention once the agents received Mr. Lambert's driver's license and did not return it to him."); *United States v. Walker*, 933 F.2d 812, 817 (10th Cir.1991) ("[T]he encounter in this case was clearly not consensual. Officer Graham retained the defendant's

10

driver's license and registration during the entire time he questioned the defendant.")).

Even after the officers returned the documents to Mr. Abernathy and Mr. Simpson, the encounter remained nonconsensual. The Tenth Circuit laid forth factors to consider in determining whether a defendant was seized in *United States v. Glass*, 128 F.3d 1398 (10th Cir. 1997): whether the encounter occurred in a confined or nonpublic space (citing *United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir.1993); *United States v. Bloom*, 975 F.2d 1447, 1453-54 (10th Cir.1992); and *United States v. Ward,* 961 F.2d 1526, 1531 (10th Cir.1992)); the officers confronting the subject were armed or uniformed (citing *Bloom*, 975 F.2d at 1454); more than one officer confronted the subject (citing *Bloom*, 975 F.2d at 1454 and *Ward*, 961 F.2d at 1533); the officers exhibited an intimidating or coercive demeanor (citing *Griffin*, 7 F.3d at 1519 and *Ward*, 961 F.2d at 1533); and the officers asked the subject potentially incriminating questions (citing *Griffin*, 7 F.3d at 1519; *Ward*, 961 F.2d at 1534; *Bloom*, 975 F.2d at 1454). *See Glass*, 128 F.3d at 1406.

The Court finds that the officers continued to control the men throughout the encounter, and that the officers' conduct throughout the stop indicated to a reasonable person that they were not free to leave. Mr. Abernathy was initially questioned in his car. He was instructed to remain in his car. The officers were armed and in uniform. There was more than one officer. Additionally, the Court finds that the officers exhibited a coercive or intimidating demeanor. From the very beginning they instructed the men where to stand or sit. The officers testified that they instructed Mr. Abernathy and Mr. Simpson where to sit and stand in an effort to prevent the two men from communicating with each other. They even told Mr. Abernathy where he could relieve himself. The officers immediately began asking incriminating questions of both men about drugs, guns and contraband after their documents were returned. Additionally, the Court finds it

11

significant that after Officer Mora spoke with Mr. Abernathy about his travel plans, he told Mr. Abernathy that he would probably be free to go in a few minutes. This would have indicated to a reasonable person that he was not free to leave at that time. Officer Mora thereby established the situation as one where he would tell Mr. Abernathy when he could leave. Neither he nor Officer Bess ever qualified or amended this instruction by telling Mr. Abernathy he was free to leave. The fact that Officer Mora first told Mr. Abernathy that he was not free to go at that time and then never amended that instruction is compelling evidence that a reasonable person would not have believed that they were free to go. *See United States v. Fernandez*, 18 F.3d 874, 882 (10th Cir. 1994) (failure to tell a suspect that he is free to leave is a factor in the consideration of whether the encounter was consensual). The Court considers all of these factors together to determine that this was not a consensual encounter. *See Glass*, 128 F.3d at 1406 (no one factor is dispositive).

### D.  Consent Given Not Voluntary

Nor did Mr. Abernathy voluntarily consent to a search of his vehicle. As the Tenth Circuit recognized in *Guzman* and *Walker*, voluntary consent can validate a search even when the consent to search is preceded by a Fourth Amendment violation. *See Guzman*, 864 F.2d at 1520-21; *see also Walker*, 933 F.2d at 817-18. "To be valid, consent to search must be free and voluntary." *United States v. Olivier-Becerril*, 861 F.2d 424, 425 (5th Cir. 1988). The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir. 1991). Where consent is preceded by a Fourth Amendment violation, the government has a heavier burden of proving consent. *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983). The voluntariness of consent is "a question of fact to

be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Where a consensual search is preceded by a Fourth Amendment violation, "the government must prove both the voluntariness of the consent under the totality of the circumstances and that there was a break in the causal connection between the illegality and the evidence obtained." *United States v. Ramstad*, 219 F.3d 1263, 1265-66 (citing *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994).

The Court finds that the Government has not proved that there was a break in the causal connection between the illegality and the evidence obtained. "The Supreme Court has provided three factors that are especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure: 1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citations omitted).

In this case, less than five minutes passed between Officer Bess giving a citation to Mr. Simpson and his questioning of Mr. Abernathy. *See Fernandez*, 18 F.3d at 883 (defendant acquiesced to search only moments after illegal detention and questioning by officer); *see also United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir. 1992) (consent not voluntary when "only minutes" passed after illegal seizure); *United States v. Recalde*, 761 F.2d 1448, 1459 (10th Cir. 1985) (no voluntary consent where only "several minutes" lapsed between an illegal detention and signing a consent form). Second, there were no intervening circumstances between the illegal detention and Mr. Abernathy's consent. Officer Bess questioned Mr. Abernathy immediately after he returned his documents to him.

Finally, the purpose and flagrancy of the illegal detention weighs against a finding of

13

voluntariness.  The Court finds that the sole purpose of the continued detention was an effort to uncover evidence of some type of crime.  The Court has found above that the officers did not have reasonable suspicion to continue questioning Mr. Abernathy.  As stated above, after the officers questioned Mr. Simpson and Mr. Abernathy about their travel plans, they continued to question them even after the purpose for the initial stop was concluded.  By the officers' account, they returned the documents to Mr. Simpson and Mr. Abernathy.  Officer Bess received valid documentation from Mr. Abernathy indicating that he was the lawful owner of the 1989 Mazda.  Officer Bess issued a citation to Mr. Simpson for speeding.  There was no justification to further question Mr. Simpson or Mr. Abernathy.  The two gentlemen should have been allowed to proceed on their way.  *See Walker*, 933 F.2d at 816 (police officer's detention of motorist after speeding ticket had been issued and subsequent questions about circumstances unrelated to speeding infraction was an unreasonable seizure under the Fourth Amendment).  The Court finds that the purpose of the continued questioning and illegal detention was to gather information and evidence that these two men were involved in some type of criminal activity.   This is a constitutionally impermissible purpose, and as such, argues against a finding of voluntariness.  *See Fernandez*, 18 F.3d at 883.

## CONCLUSION

For the above-stated reasons, Mr. Abernathy was arrested and the contraband seized from his car in violation of his Fourth Amendment right to be protected from unreasonable searches and seizures.  Therefore, both the arrest and the evidence obtained from the seizure are suppressed as fruits of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

IT IS THEREFORE ORDERED that the motion to suppress is hereby **granted**.

Dated this 12th day of June, 2001.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Attorney for Government:
F.G. Maxwell Carr-Howard

Attorney for Defendant:
Judith Rosenstein